**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

KENNETH COUNCE,

       Plaintiff,

v.

                                Case No. 13-3199-JTM-KGS

RYAN M. WOLTING, et al.,

       Defendants.

**MEMORANDUM AND ORDER**

Plaintiff Kenneth Counce brings this pro se civil rights action under 42 U.S.C. § 1983 asserting claims of excessive force and deliberate indifference to his medical needs. Defendants Ryan Wolting and Gregory Arnold of the Kansas Highway Patrol ("KHP") and Ellsworth County defendants David Chamberlain and Tracy L. Ploutz assert that they are entitled to qualified immunity and move for summary judgment (Dkts. 158 and 188). For the reasons stated below, the court grants defendants' motions for summary judgment.

    **I.**    **Uncontroverted Facts**

There are several controverted facts, however, the court finds the following facts to be uncontroverted for purposes of summary judgment. To the extent that relevant facts are controverted, the court resolves these in favor of plaintiff—the nonmoving party.

On October 22, 2013, KHP Trooper Wolting drove up beside a maroon van heading west on I-70.  The driver, later identified as Counce, turned off at Exit 221. Wolting followed and subsequently pulled over Counce for failing to use his turn signal at the bottom of the ramp.[1]

After a few minutes, Counce asked to go to the nearby rest stop to use the restroom.  Wolting allowed Counce to drive the van to the rest stop, and Wolting followed him in his patrol cruiser.

At the rest stop, Wolting patted down Counce.  Counce advised that he had approximately $4000 in cash.  Counce went to the restroom, and then returned to Wolting's police cruiser.

Wolting asked Counce his name and date of birth, however, Counce could not provide complete answers to Wolting's questions.[2]  Wolting's dashcam video showed that at some point in their conversation, Wolting directed Counce to get out of his cruiser, put his "hands on the car" and "spread his legs."  (Dkt. 188-8, Ex. F).  When Wolting grabbed Counce's right arm, Counce abruptly turned around.  Counce claims Wolting yanked his arm with such force that it swung him around.  Counce claims that Wolting then tripped and fell backwards.  Wolting, however, claims that Counce turned around and started punching Wolting in the face.

---

[1] Counce claims the sun's reflection may have interfered with Wolting's vision because of the angle of the van when Counce turned, but the video from Wolting's patrol cruiser shows Counce turned left without using his turn signal.

[2] Defendants state Counce provided false answers.  Counce claims that he was unable to reasonably answer Wolting's questions.

Two civilian bystanders ("the bystanders") witnessed the altercation and intervened to assist Wolting. During the altercation, Wolting used a taser on Counce and both men received cuts and bruises. Wolting also called for backup and KHP Trooper Arnold and other law enforcement officers arrived on the scene.

Wolting requested that Ellsworth County Emergency Medical Service ("EMS") respond to the scene. Upon arrival, the troopers helped Counce walk over to EMS. EMS examined Counce and removed the taser probes. Photographs of Counce's injuries showed a gash on the back of his head, minor scrapes, and a cut on his thumb. EMS did not take Counce to the hospital.

The troopers placed Counce in the front passenger seat of Arnold's police car. Arnold transported Counce to the Ellsworth County Jail, where Counce was detained between October 22 and December 2, 2013. At that time, Ploutz was the Sheriff of Ellsworth County, Kansas. Chamberlain was an Ellsworth County Sheriff's Deputy.

Ploutz was aware of Counce's arrival to the jail on October 22, but was in and out of the facility on other business that day and was not directly involved with the booking process. Chamberlain assisted with booking Counce, but had no other interaction with him on October 22 once the booking process was complete. Chamberlain noted that Counce was acting and/or talking in a strange manner, and refused to answer questions without an attorney present. Counce did not answer any medical questions on the form, but had a black eye in his booking photo.[3]

---

[3] Defendants claim Counce "refused" to answer the medical questions. Counce responds that this statement is ludicrous because he suffered pain, anguish, embarrassment, and mental distress in Arnold's

The Ellsworth County Jail contracted with a third-party, Shawn McGowan, a certified physician assistant, to provide medical services to the jail. McGowan visited the facility once a week, usually on Tuesdays, if needed. On other days, McGowan provided telephone consultations to the jail.

Counce submitted six written medical requests during the 40 days he was detained in the jail. On October 30, 2013, Counce complained of nausea and a potential head injury and/or concussion. Counce noted that he had been tased and had cold extremities since October 22, 2013. McGowan noted that he saw Counce and evaluated him. McGowan offered Tylenol or ibuprofen, and Counce refused at that time.[4]

On November 9, 2013, Counce stated that he was struck in the left eye during his arrest, and now that area was swollen and throbbing with pain. Counce noted that the swelling/pain "was there for a little for the past two weeks but it swelled up and started hurting the evening of November 8, 2013." (Dkt. 163-4, at 3). McGowan evaluated Counce and prescribed Clindamycin, 300 mg three times a day, on November 11, 2013. McGowan stated that he "made sure [Counce] did not have any step-offs or tenderness along his orbits. Most of [Counce's] pain was down into the maxilla area." (Dkt. 163-5, at 2). McGowan again offered anti-inflammatories, but Counce declined. Counce took the clindamycin, however, which improved the swelling and pain.

---

car during transport to the jail. Counce also claims that he told defendants he was in severe pain, needed water, and requested to go to the hospital.

[4] Counce claims that ibuprofen made him vomit, and does not recall being offered Tylenol.

Counce asked to see McGowan on November 16, 2013, to inform him that the swelling in Counce's face was improving. McGowan noted that Counce's face still felt tender in the maxilla area, but that also was improving.

On November 24, 2013, Counce told McGowan that he tried to tell Ploutz and his deputies and the KHP troopers that he had pain in his right shoulder. But McGowan stated this was the first time Counce sent him a request noting pain in his shoulder. Counce also complained of lower lumbar back pain at that time.

Counce also wrote McGowan a letter dated November 27, 2013, in which he stated that injuries keep showing up weeks later after the attack. "It's like being in a car wreck and the injur[ies] that were not obvious at first blush, start to appear days, weeks, or months later." (Dkt. 163-6, at 3). Counce then noted pain in his lower right lumbar area of his back and right shoulder rotator cuff.

McGowan saw Counce for his pain on November 27, 2013, and Counce had full range of motion in his shoulder. McGowan did not feel it was a fracture. If anything, McGowan thought "a possible internal and that would take an MRI, which [was] not needed at [that] time." (Dkt. 163-5, at 2). According to McGowan, Counce needed to take anti-inflammatories, ice, and start some stretching, but Counce again refused the anti-inflammatories. For Counce's back, McGowan also suggested stretches, anti-inflammatories, and ice because it was the first line treatment. McGowan noted that if the pain continued to get worse or if Counce developed numbness or tingling sensation in his legs, then further workup would be needed.

Counce also had one undated medical request in which he requested dental floss picks to remove food particles stuck between his teeth and complained of sweating and cold extremities. McGowan noted in his report that he was scheduled to see Counce on December 3, 2013, but that Counce left the Ellsworth County Jail on December 2, 2013. McGowan believed Counce's face injury had been improving.

In January 2014, Counce was seen by a physician when he was transferred to Texas. Counce's radiology reports noted a cortical irregularity about the medial wall of the left maxillary sinus suggesting a minimally displaced fracture, sclerosis in the right shoulder, high riding humeral head which can be seen with a rotator cuff tear, and joint osteoarthrosis in the left knee. Counce was examined again in September 2015 for pain in his neck and right shoulder, and again in September 2017 for chronic pain in both shoulders and in the left knee.

Based on these events, Counce filed the instant case alleging defendants used excessive force and were indifferent to his medical needs. Counce seeks monetary damages for these violations. Defendants argue that they committed no constitutional violations, and move for summary judgment.

## II.    Summary Judgment Standards

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury

to decide the issue in either party's favor. *Haynes v. Level 3 Communs.*, 456 F.3d 1215, 1219 (10th Cir. 2006).

The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol–Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986)). The nonmovant must then bring forth specific facts showing a genuine issue for trial. *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). The court views all evidence and reasonable inferences in the light most favorable to the non-moving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004). However, the court can disregard statements that are conclusory or made without personal knowledge of the matter. *See Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006); Fed. R. Civ. P. 56(e); Fed. R. Evid. 602.

### III.    Qualified Immunity

Defendants claim that they entitled to qualified immunity—an "entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Government officials performing discretionary functions are typically eligible for qualified immunity unless two conditions are met: (1) the official violated a statutory or constitutional right and (2) the right was clearly established at the time the alleged violation occurred. *Lowery v. Cty. of Riley*, 522 F.3d 1086, 1091 (10th Cir. 2008). The court may consider either prong of the qualified immunity test first. *Panagoulakos v. Yazzie*, 741 F.3d 1126, 1129 (10th Cir. 2013). Because defendants have asserted a qualified immunity defense, the burden shifts to Counce to show the relevant law was

clearly established, and to come forward with sufficient facts to show defendants violated the clearly established law. *Foote v. Spiegel*, 118 F.3d 1416, 1424 (10th Cir. 1997). Defendants "bear[] the normal summary judgment burden of showing no material facts that would defeat the qualified immunity defense remain in dispute." *Id.*

## IV.    Counce's Excessive Force Claims against Wolting

Counce claims that he was blindsided and struck on the left cheekbone/upper jaw area with an unknown weapon or fist while Counce was not actively resisting arrest. Counce alleges that Wolting employed his taser until it was empty. Counce asserts that Wolting sat on his knees and yanked his shoulder until it tore. Counce also states that Wolting failed to intervene when the bystanders attacked Counce and one of the bystanders prevented Counce from breathing by sitting on his chest. Finally, Counce alleges Wolting fastened the handcuffs on too tightly, cutting into his right wrist.

### A.    The Physical Altercation

"[A]ll claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard[ ] . . . ." *Stewart v. City of Prairie Vill., Kan.*, 904 F. Supp. 2d 1143, 1153 (D. Kan. 2012) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)); *see also Estate of Booker v. Gomez*, 745 F.3d 405, 419 (10th Cir. 2014) (the determination of which constitutional amendment applies to an excessive force claim depends on where the plaintiff was in the criminal justice system when the force occurred). To state a claim of excessive force under the

Fourth Amendment, Counce must show that (1) a "seizure" occurred and (2) that the amount of force used during the seizure was "unreasonable."

It is undisputed that Wolting seized Counce. But the court must determine whether Wolting's actions were "'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." *Graham*, 490 U.S. at 397; *Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1313 (10th Cir. 2009). The court evaluates reasonableness under a totality of the circumstances approach, and considers and balances the following factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Thomson*, 584 F.3d at 1313 (quoting *Graham*, 490 U.S. at 396).

The severity of the traffic offense was minor, however, the stop escalated after Counce was unable to provide a driver's license and correct information to Wolting's questions. Wolting asked Counce to get out and place his hands on the patrol cruiser. In Wolting's video, Counce complied with Wolting's request, then abruptly turned around when Wolting placed Counce's right hand behind his back. Although Counce and Wolting moved off camera, they are heard fighting on the ground. The recording shows that the bystanders ran to assist Wolting. Wolting claims Counce punched him at least four times with a closed fist in the head and face. Photographs show a red mark on Wolting's cheek under his right eye, another on the right side of his chin, and cuts on both elbows and knuckles. (Dkt. 188, Ex. B).

While Counce claims Wolting was not satisfied until he could arrest Counce on felony charges, Counce lacks personal knowledge and/or evidence to support this allegation. Furthermore, the court has viewed the troopers' videos from their patrol cruisers, the bystanders' witness statements, and photographs of Wolting's injuries and finds that they support Wolting's rendition. And Counce lacks personal knowledge and/or evidence to support his allegations that defendants edited or modified the videos from their patrol cruisers. *See* Fed. R. Civ. P. 56(c); D. Kan. R. 56.1(d).

Wolting's video establishes as an uncontroverted fact that Counce physically resisted Wolting's attempt to arrest him and further that he confronted and wrestled with Wolting on the ground. No reasonable jury could find that Wolting initiated the physical assault. Wolting had the right to use an amount of force that was reasonably necessary to overcome Counce's resistance. And Counce fails to cite evidence that the force used by Wolting was unreasonable in view of Counce's physical resistance to arrest.

## B.    Wolting's Use of a Taser

Counce alleges that Wolting tased him until his taser clicked on empty. The taser download report shows that Wolting pulled the trigger for eight seconds at 9:49:30 a.m., another time for one second at 9:49:39 a.m., and a final time for one second at 9:49:40 a.m. (Ex. D).

Under prevailing Tenth Circuit authority, "it is excessive to use a [t]aser to control a target without having any reason to believe that a lesser amount of force—or a verbal command—could not exact compliance." *Gomez*, 745 F.3d at 424–25. Unlike the

circumstances in *Gomez*, there is no evidence in the record to support a finding that Wolting used the taser on Counce after he was already handcuffed and subdued. *Compare id.* at 424 ("Sergeant Rodriguez used the taser on Mr. Booker for three seconds longer than recommended when he was already handcuffed on the ground and subdued by multiple deputies.").

Counce alleges that one of the bystanders repeatedly yelled, "Shoot'em! C'mon, shoot'em!" and "Shoot'em again" (Dkt. 48, at 7), however the recording of the incident shows no such comments were made. Once again, Counce lacks personal knowledge and/or evidence to support his allegations that defendants edited or modified the videos from their patrol cruisers. *See* Fed. R. Civ. P. 56(c); D. Kan. R. 56.1(d).

On the other hand, the recording shows that while Counce cried "ow" several times, other voices shouted, "stop fighting," "hands down," "hold him down," and "what's up with this guy."[5] After Counce quit screaming, Wolting told Counce to stop moving three separate times. Meanwhile Counce hoarsely repeated "I can't breathe." Wolting or one of the bystanders responded, "you're right you can't breathe" and "stop fucking fighting then." Counce then said, "let me breathe" several times, but the audio discloses that Counce was breathing and Wolting and the two bystanders discussed how to move Counce.

When Arnold arrived, the troopers again instructed Counce to stop moving and to stay still. The troopers warned Counce that they were going to turn him around and

---

[5] Because the altercation is not visible in the video, the court is unsure who said what in the video.

if he resisted, they would smash his head back into the concrete.  But that did not happen.

Wolting believed that Counce continued to resist arrest, which was corroborated by the bystanders' witness statements.  Under these circumstances, a reasonable jury could not conclude that Wolting's use of his taser was disproportionate to the need to restrain Counce.  *Compare Cavanaugh v. Woods Cross City*, 625 F.3d 661, 665 (10th Cir. 2010) (use of taser unconstitutional where jury could "conclude that [the victim] did not pose an immediate threat" to officer or others and where victim was not actively resisting); *Porro v. Barnes*, 624 F.3d 1322, 1329 (10th Cir. 2010) ("The use of tasers in at least some circumstances—such as in a good faith effort to stop a detainee who is attempting to inflict harm on others—can comport with due process."); *Cortez v. McCauley*, 478 F.3d 1108, 1128 (10th Cir. 2007) (finding excessive force where plaintiff did not "actively resist [ ] seizure" and "cooperated fully").

Wolting's actions were "objectively reasonable" in light of the present circumstances.  Counce posed an immediate threat because he initiated the assault and resisted arrest.  There is no evidence to support a finding that a lesser degree of force would have exacted Counce's compliance or that Wolting tased Counce for an unreasonable amount of time.

### C.    Failure to Intervene

Counce contends that Wolting failed to intervene when the bystanders attacked Counce, punched him in the face, and prevented him from breathing by sitting on his

chest.[6]  "Personal involvement is not limited solely to situations where a defendant violates a plaintiff's rights by physically placing hands on him."  *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008).  An officer may be liable for the constitutional violation that another commits, if the officer "'set[s] in motion a series of events that the [officer] knew or reasonably should have known would cause others to deprive the plaintiff of [his] constitutional rights,' thus establishing the 'requisite causal connection' between the [officer's] conduct and a plaintiff's constitutional deprivations."  *Herrera v. Santa Fe Pub. Sch.*, 41 F. Supp. 3d 1027, 1142 (D.N.M. 2014) (quoting *Trask v. Franco*, 446 F.3d 1036, 1046 (10th Cir. 2006)).

Wolting's video showed that the bystanders ran to assist him when he was struggling with Counce.  One of the bystanders told Arnold that he punched Counce in the face, which is also reflected in his statement.  (Dkt. 188-4).  The other bystander explained that he placed his hand around Counce's neck and his knee in Counce's back, and remained in this position until Wolting could restrain Counce with handcuffs.  Both bystanders stated that Counce had his hand on Wolting's gun trying to remove it and further that Counce continued to struggle and fight with all three men.

Even if the bystanders could be considered private parties jointly engaged in Wolting's actions for purposes of § 1983 liability,[7] the court finds that the force used by

---

[6] Counce originally alleged that Wolting hit him in the eye/jaw area, but one of the bystanders admitted to punching Counce in the face when he helped Wolting restrain Counce.

[7] "'Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of the statute.  To act 'under color' of law does not require that the accused be an officer of the State.  It is enough that he is a willful participant in joint activity with the State or its agents[.]'" *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970) (quoting *United States v. Price*, 383 U.S. 787, 794 (1966)).

the bystanders and Wolting to gain control over the situation and restrain Counce was not excessive. Therefore, Counce's claim that Wolting failed to intervene also fails because no constitutional violation occurred. *See Brooks v. Brown*, No. 95-1386, 94 F.3d 655, 1996 WL 460048, at *3 (10th Cir. Aug. 14, 1996) (the failure-to-intervene theory is derivative of an excessive force claim; if a plaintiff did not suffer excessive force, then there can be no failure-to-intervene claim). Moreover, there is no evidence that Wolting should have known the bystanders would deprive Counce of his constitutional rights.

### D.    Counce's Handcuffs

Counce claims that the troopers refused to remove or loosen Counce's handcuffs and further ordered EMS to stay away from his handcuffs. "In some circumstances, unduly tight handcuffing can constitute excessive force where a plaintiff alleges some actual injury from the handcuffing and alleges that an officer ignored a plaintiff's timely complaints (or was otherwise made aware) that the handcuffs were too tight." *Cortez*, 478 F.3d at 1129.

While EMS was examining Counce, he complained about the handcuffs cutting into his wrists. He asked for the handcuffs to be taken off. In KHP Trooper Eringer's video (Ex. H), one of the troopers responded, "we're not going to take them off." He then said, "your wrist is all right" and "don't move." The trooper explained to Counce that he needed to stay still.

Later in the video, Counce exclaimed that there was something wrong with his wrist. EMS explained that it was just the angle he had his wrist at because Counce was sitting on a certain side. One of the troopers adjusted Counce and said, "there, leave it

like that." Counce responded, "the right one, not the left one . . . the right one." A few minutes later, a trooper asked Counce, "anything else that's hurting right now?"

Based on the discussions in the video, EMS and the trooper were trying to help Counce get more comfortable to the extent allowable and still do their jobs. They did not ignore his pleas. At no point in the video are the troopers heard telling EMS not to go near Counce's shoulder or stay away from his handcuffs. The video confirms that a trooper responded to Counce's complaint and attempted to alleviate his pain.

Regardless, Counce must also show that he suffered an actual injury. *See id.* ("We believe that a claim of excessive force requires some actual injury that is not de minimis, be it physical or emotional."). Counce claims that he has a permanent, dime-size scar on his wrist, but he has provided no evidence to support this claim. Counce's medical records do not reflect any injuries to his wrists. *Compare Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1209 (10th Cir. 2008) (defendants were not entitled to summary judgment when medical records reflected diagnoses of permanent nerve injuries and carpal tunnel in the wrists, in which the treating physician concluded that handcuffing was the cause of such injuries). Furthermore, Counce's dime-size scar is de minimis as he does not complain about ongoing pain or a persistent injury as a result of this scar from the handcuffs.

To the extent that Counce is claiming the way Wolting grabbed his arms and handcuffed his wrists constituted excessive force, the court finds Wolting's actions were objectively reasonable under the uncontroverted facts. As noted above Counce tried to grab Wolting's gun and was actively resisting arrest. A reasonable jury could not find

that the amount of force Wolting used was disproportionate to the need to restrain Counce under these circumstances.  Additionally, Counce noted in his Citizen Report Form (Dkt. 188-5, at 25) that he had injured his left hand and shoulder a few weeks earlier at work.  Any aggravation to Counce's pre-existing hand and shoulder injuries are de minimis, and Wolting is entitled to qualified immunity on this claim.  *See, e.g.,* *Astorga v. Vick*, No. 15-3191-CM, 2017 WL 1397540, at *4 (D. Kan. Apr. 17, 2017).

**V.     Counce's Claims of Indifference to Medical Needs**

Counce argues that Wolting and Arnold violated the Eighth Amendment by interfering with his medical treatment.  Counce asserts Wolting acted with deliberate indifference to his medical needs after he arrived at the Ellsworth County Jail.  Counce also claims Wolting and Arnold acted with deliberate indifference to his emotional distress.

Pretrial detainees are protected under the Due Process Clause of the Fourteenth Amendment rather than the Eighth Amendment.  *Lopez v. LeMaster*, 172 F.3d 756, 759 n.2 (10th Cir. 1999) (citing *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979)).  However, the court applies the same analysis as that applied in Eighth Amendment cases brought pursuant to § 1983.  *Id.*

Deliberate indifference to a pretrial detainee's serious medical needs contains both an objective and subjective component.  *Blackmon v. Sutton*, 734 F.3d 1237, 1244 (10th Cir. 2013).  "Objectively, the patient's medical needs must be 'so obvious that even a lay person would easily recognize the necessity for a doctor's attention.' . . . Subjectively, the defendant-official must 'know[ ] of and disregard[ ] an excessive risk

to inmate health or safety.'" *Id.* (internal citations omitted). Counce need not show that defendants acted or failed to act believing that harm would occur; rather, "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Astorga*, 2017 WL 1397540 at *3 (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). Moreover, whether an official had the requisite knowledge of a substantial risk is a question of fact. *Id.*

### A.    Interference with Medical Treatment by EMS

Counce alleges that Wolting interfered with his medical care when he told EMS not to go near Counce's shoulder, wrists, or to remove his handcuffs. As noted above, this claim is contrary to the troopers' videos and evidence in the record.

In Arnold's video (Ex. G), Counce moaned, and occasionally yelled "ow." Counce stood up beside a patrol vehicle. The troopers searched Counce one more time, and then slowly helped him walk over to EMS.

Counce complained that the handcuffs were cutting his wrist, but the troopers responded that he was alright and needed to stop moving. The troopers explained to EMS that Counce's handcuffs were not that tight. Counce also protested about his shoulder hurting when EMS moved him. But a short while later, a trooper asked "better?" EMS noticed a small abrasion on Counce's left thumb, and a trooper asked her to put a Band-Aid on it. EMS asked Counce if he hurt anywhere else. Counce answered that his jaw, shoulder, and wrist hurt.[8] At another point in the video, Counce told EMS that he could not swallow. She replied okay, just a minute, and then told

---

[8] It is unclear from the video if Counce said anything else hurt.

Counce that she was going to put on a blood pressure cuff.  EMS removed the taser probes, and eventually released Counce to the troopers for transport to the Ellsworth County Jail.

EMS thoroughly examined Counce at the rest stop.  As noted above, the recordings refute any claim that the troopers told EMS to stay away from Counce's shoulder or his handcuffs.  At no time did defendants tell EMS to hurry up or quit examining Counce.  Moreover, EMS did not find that Counce's injuries required other emergency treatment or transport to a hospital, and Counce did not ask for further treatment.  The photographs of Counce's injuries show nothing serious—a gash on the back of his head and minor cuts and scrapes.  *See, e.g.*, *Bailey v. Feltmann*, No. 4:14-CV-47 CAS, 2014 WL 7185885, at *6 (E.D. Mo. Dec. 16, 2014), *aff'd*, 810 F.3d 589 (8th Cir. 2016) (citing cases).  To the extent that Counce suffered a torn ligament or tendon, these were not obvious to EMS, let alone a layperson.  The evidence in the record is contrary to Counce's claim, and a reasonable jury could not find that defendants disregarded Counce's health or interfered with his medical treatment.

### B.    Counce's Ride to the Jail

Counce asserts that Arnold observed the severity of his injuries and anguish, yet refused to loosen and/or remove his handcuffs during the ride to the jail.

In Arnold's patrol car, Counce complained about his handcuffs being tight. Arnold said, "the handcuffs are not designed for comfort man, the more you move the worse it's going to get."  Arnold also told Counce, "we can readjust things as soon as we get there and it will be better."  Counce said "ow" occasionally and winced, but he

did not scream or cry out in pain.  At no point during the car ride did Counce ask for water or say that he was thirsty.  Once again, Counce fails to show that a reasonable jury could find it was obvious he suffered from significant injuries—beyond mere discomfort—and further that Arnold was aware of Counce's injuries and disregarded them.

### C.     Counce's Interrogation and Booking Process

Counce alleges that Ellsworth County defendants and Wolting were present while Counce was interrogated, during which time he requested and should have received medical care.  Ellsworth County defendants deny participating in any interrogation or interview of Counce on October 22, 2013, and never participated in a joint interview with Counce and KHP.  Similarly, Wolting denies participating in an interrogation of Counce after he was released to the Ellsworth County Jail for booking.  The court has reviewed Counce's claims, and it appears that Counce is construing the procedure and questions asked of him during the booking process to be an interrogation.

Chamberlain was involved in booking Counce into the jail on October 22, 2013.  Ploutz was not directly involved, and Counce does not make a claim of supervisor liability.[9]  Counce's booking photo shows one black eye, but no other visible injuries to his head or neck.  While Counce asserts that he begged to be taken to the hospital on

---

[9] "[Section] 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which 'subjects, or causes to be subjected' that plaintiff 'to the deprivation of any rights . . . secured by the Constitution . . . .'"  *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010) (quoting 42 U.S.C. § 1983).

October 22, 2013, there is no evidence in the record to support his claim.  There is no evidence of such a request on the videos of the incident.  At the jail, Counce did not answer the routine medical questions on the booking form, nor draft a written medical request until October 30, 2013.  Even if Counce complained at the jail that he was in pain and requested to be taken to the hospital, Counce had been examined by EMS a couple hours earlier.  EMS did not take Counce to the hospital, and a reasonable jury could not find that Counce's medical needs were so obvious that a lay person would easily recognize the need for a doctor's attention.  Counce even acknowledged some of his injuries were not obvious at first.  As noted above, Counce said, "[i]t's like being in a car wreck and the injur[ies] that were not obvious at first blush, start to appear days, weeks, or months later."  (Dkt. 163-6, at 3).  Likewise, there is no evidence to support a finding that defendants knew of an excessive risk to Counce's health during the booking process and disregarded it.

### D.    Counce's Claims of Medical Indifference During His Detention

Counce alleges that Ploutz was deliberately indifferent to his medical needs during his approximately 40-day detention in the Ellsworth County Jail.  This is not a case where defendants denied Counce access to medical care.  Counce was examined and received medical care from McGowan in accordance with the Ellsworth County Jail's medical procedure.  McGowan examined Counce in person in response to Counce's requests made on October 30, November 9, 24, and 27, 2013.  McGowan also consulted with Counce in response to his request made on November 16, though it is unclear whether this was done in person or via telephone.

Once again, a reasonable jury could not find that Counce's medical needs were obvious to the point that Ploutz—a lay person—would easily recognize the need for a doctor's attention.  A certified physician assistant did not believe Counce's medical needs required hospitalization, x-rays, or additional treatment beyond what was prescribed.[10]  And there is no evidence to support a finding that Ellsworth County defendants knew of an excessive risk to Counce's health during his 40-day detention and disregarded it.  They provided treatment to Counce in accordance with McGowan's instructions.

Counce appears to argue that he was entitled to care different from or additional to the care McGowan provided him, such that Ploutz should be liable.  But these claims do not give Counce relief under § 1983.  *See Coppinger v. Townsend*, 398 F.2d 392, 394 (10th Cir. 1968) ("A difference of opinion between a physician and a patient does not give rise to a constitutional right or sustain a claim under § 1983.").  Counce's constitutional right is to medical care—which was furnished—not to the type or scope of medical care he personally desires.  *Id.*  Thus, Ploutz is entitled to qualified immunity on this claim.

### E.    Emotional Distress

Counce claims that defendants were deliberately indifferent to his emotional distress.  "[M]ental and emotional distress can constitute a compensable injury in suits for damages under 42 U.S.C. § 1983 based upon violations of constitutional rights . . . ." *Perkins v. Kansas Dep't of Corr.*, 165 F.3d 803, 807 (10th Cir. 1999).  However, defendants

---

[10] Counce's claims against McGowan were previously dismissed (Dkt. 51).

did not violate Counce's constitutional rights, therefore, they are not liable for any mental or emotional distress that Counce may have suffered.

### VI.    Conclusion

The court finds that no genuine issue of material fact exists such that a reasonable jury could find that Wolting used excessive force during Counce's arrest. Wolting did not violate Counce's constitutional right when he did not intervene during the altercation between Counce and the bystanders—which occurred while the bystanders were helping Wolting restrain Counce.  Additionally, KHP defendants did not interfere with EMS's examination and medical treatment of Counce; nor could a reasonable jury find that they were deliberately indifferent to Counce's medical needs and emotional distress.  Similarly, Counce failed to show that a reasonable jury could find Chamberlain and Ploutz were indifferent to Counce's medical needs and emotional distress during the booking process and Counce's detention at the Ellsworth County Jail.  Therefore, defendants are entitled to qualified immunity on Counce's claims.

IT IS THEREFORE ORDERED this 2nd day of March, 2018, that Ellsworth County defendants Chamberlain and Ploutz's motion for summary judgment (Dkt. 158) is granted.  Chamberlain and Ploutz are entitled to qualified immunity.

IT IS FURTHER ORDERED that KHP defendants Wolting and Arnold's motion for summary judgment (Dkt. 188) is granted.  Wolting and Arnold are entitled to qualified immunity.

This case is closed.

_____s/ J. Thomas Marten_____
J. THOMAS MARTEN, JUDGE